<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOSEPH ARUANNO, <br><br> Plaintiff, <br><br> v. <br><br> DR. LUDMINA GLAZMIN, *et al.*, <br><br> Defendants. | Civ. No. 03-3696 (GEB) <br><br> **OPINION** |

<u>**BROWN, Chief Judge**</u>

  This matter comes before the Court upon: (1) defendants R. David Parrish and Joseph A Knowles's (collectively "State Defendants") motion for summary judgment; (2) defendants Drs. Lyudmila Glazman, Neal Brandoff, and Robert Roth's (collectively "CMS Defendants") motion for summary judgment; and (3) defendant Dr. Wayne Blodgett's motion for summary judgment. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, and for the reasons set forth below, will grant each of the defendants' respective motions.

**I. BACKGROUND**

  Plaintiff Joseph Aruanno ("Plaintiff") filed the Complaint *pro se* on August 14, 2003. On February 25, 2004, the Court appointed *pro bono* counsel to represent Plaintiff in this case. Plaintiff filed the Amended Complaint on June 18, 2004. Plaintiff asserts his claims pursuant to 42 U.S.C. § 1983 against defendants Parrish, Knowles, Glazman, Brandoff, Roth, and Blodgett (collectively "Defendants").

  This case concerns Plaintiff's involuntary medication during his imprisonment in New

Jersey State Prison. On or about August 25, 2000, Plaintiff was transferred from South Woods State Prison ("South Woods") to Riverfront State Prison ("Riverfront"). (CMS Defs.' Statement ¶ 64.) During his time at Riverfront, Plaintiff was examined and treated by a number of mental health staff.

### A. The Treatment Review Committee's September 30, 2002 Authorization of Involuntary Medication

On August 23, 2002, Dr. Brandoff examined Plaintiff while he was in detention. (CMS Aruanno at 1233.) Plaintiff was referred to detention because he had sent a letter to the Parole Board that sounded "ominously threatening." (*Id.*) During his meeting with Dr. Brandoff, Plaintiff expressed his refusal to take antipsychotic medication. (*Id.*)

On or about September 4, 2002, Plaintiff was examined by Dr. Kokonos, who noted that Plaintiff was angry, frustrated, and easily irritated. (*Id.* at 1236-37.) According to Dr. Kokonos, Plaintiff stated that "it was not only his right but his duty to take revenge on those he believes have harmed him and to do so by force." (*Id.* at 1237.) Dr. Kokonos informed him that "if he continued to speak this way and hold such beliefs that he could be force medicated . . . ." (*Id.*)

On or about September 17, 2002, Dr. Brandoff again evaluated Plaintiff. (*Id.* at 1240-41.) According to Dr. Brandoff, "[i]n view of [Aruanno]'s chronic, severe paranoid/persecutory delusions with threats of violent revenge, . . . I have started him on Risperdal 2 mg solution po HS and applied to the Treatment Review Committee for approval for Involuntary Forced Meds." (*Id.* at 1241.)

On or about September 30, 2002, the Treatment Review Committee ("TRC") at Riverfront State Prison met to discuss whether to subject Plaintiff to involuntary medication. (*Id.* at 1243.) Present at the meeting were Drs. Parrish, Blodgett, and Kaldany, as well as patient advocate Wilma and a Department of Corrections ("DOC") administrative assistant. (*Id.*) According to Dr. Kaldany, "[t]he reports indicated that [Plaintiff] recently had written a letter to

2

the Parole Board which was seen as threatening and [that] he had received charges for said letter," although the charges were dropped.  (*Id.* at 1244.)  Dr. Kaldany further stated that "[a]lthough [Plaintiff] was generally polite, at times of stress and confrontation he became grandiose, sarcastic and uninterruptable." (*Id.*)

Dr. Kaldany noted that the TRC members initially felt that the risk-benefit assessment did not clearly favor forced medication, mainly because Plaintiff had not exhibited nor voiced any physically harmful behavior.  (*Id.*)  Upon further review of the record, however, the TRC found "significant concerns" warranting involuntary medication.  (*Id.* at 1245.)  "Foremost were documented sessions in which [Plaintiff] voiced violent intentions against his perceived detractors, *i.e.* lawyers, doctors, clinicians, judges." (*Id.*)  According to Dr. Kaldany, Plaintiff also "discussed future intentions of exacting revenge on the system by either blowing up a building or taking some dramatic and violent action . . . ." (*Id.*)  He further noted that Plaintiff's primary physician found that Plaintiff was "increasingly paranoid and speaking more directly of taking revenge on the system in a violent and potentially deadly fashion." (*Id.*)  Dr. Kaldany noted that "his threatening letter to the Parole Board came on the heels of revealing these thoughts to the clinician." (*Id.*)  The TRC determined that "the level of dangerousness and potential harm inflicted by [Plaintiff] and potential gain from psychotropic medications exceed the potential harm from them." (*Id.*)  The TRC also began plans to move Plaintiff to a higher level of care.  (*Id.*)

On October 1, 2002, Dr. Blodgett met with Plaintiff, who had received written notification of the TRC's decision to authorize involuntary medication.  (*Id.* at 1246.)  Plaintiff's advocate was present to explain the appeals process to him.  (*Id.*)  Dr. Blodgett noted that Plaintiff continued to be preoccupied with themes of persecution, conspiracy, unfairness, and illegality. (*Id.*)  Although Dr. Blodgett noted that there was no need for a suicide watch at the time, he stated that "[p]sychotropic meds may allow the patient to think more clearly and feel less paranoid." (*Id.*)

3

On October 24, 2002, Dr. Mucowski stated that Plaintiff "experiences negative/ suspicious view of interpersonal contacts that interfere with his ability to develop and maintain trusting interpersonal relationships," and that his "thought processes currently result in revenge fantasies that involve violence and compromise his ability to feel safe." (*Id.* at 1259.) Dr. Mucowski also noted that Plaintiff suffered from "periodic mood dysphoria, irritability and agitation." (*Id.*) Involuntary medication with Risperdal began on or about October 24, 2002. (*Id*. at 162, 1262.)

### B. The TRC's November 7, 2002 Authorization to Continue Involuntary Medication

On or about November 7, 2002, the TRC met to review whether to continue involuntary medication of Plaintiff for an additional 180 days. (*Id.* at 1269.) During his interview with the TRC, Plaintiff indicated that he wanted "CMS and DOC personnel to acknowledge that he is persecuted and was wrongfully convicted." (*Id.* at 1269-70.) According to Dr. Brandoff, Plaintiff "generalizes what he perceives to be official malfeasance in his case and generalizes it to the whole system," and believes that his case is also corrupt. (*Id.* at 1270.) After the interview, the TRC authorized involuntary forced medication for an additional 180 days. (*Id.*)

On or about November 15, 2002, Dr. Blodgett found that Plaintiff's "paranoid and persecutory obsessions [were] evident." (*Id.* at 1271.) Dr. Blodgett entered a TRC report indicating that there was a substantial likelihood of serious physical harm to himself or to others, and that Plaintiff did not consider himself delusional although he acknowledged depression and anxiety. (CMS Defs.' Statement ¶ 195.)

On or about December 12, 2002, Dr. Mucowski noted that Plaintiff has an "extensive [history] of delusional order and resistance to taking psychotropic medication." (CMS Aruanno at 1278.) Dr. Mucowski noted that "delusions [and] obsessions related to his incarceration and treatment by the penal system and courts preoccupy his conversation." (*Id.* at 1279.) According to Dr. Mucowski, although Plaintiff "[did] not experience homicidal/suicidal preoccupations,"

4

"[n]o medication seems to be able to dislodge or mitigate his delusions." (*Id.*)

On or about March 27, 2003, Dr. Brandoff noted that Plaintiff exhibited "[p]aranoid thinking, persecutory delusions, pervasive suspiciousness, [and] promises to seek 'justice' . . . ." (*Id.* at 148.) According to Dr. Brandoff, "[s]everal of his peers have reported that he has threatened them and they are concerned about violence from him." (*Id.*) Dr. Brandoff noted that "his peers likely see [his comments] as a more immediate threat, and this grandiose defense mechanism of his does not endear him to his peers," and that it may "even place[] him in physical danger." (*Id.*)

On or about April 11, 2003, Dr. Brandoff reported that Plaintiff had not adjusted well in the general population, and that he "has gone through 9 [cell mates] recently, and has difficulty getting along with anyone." (*Id.* at 162.) According to Dr. Brandoff, "[p]sychotherapy has revealed a rather entrenched delusional system that makes the Judiciary and DOC into evil powers persecuting him," and "retributive violence [] a form of justice in his opinion." (*Id.*)

On April 28, 2003, Dr. Glazman discussed with Plaintiff the benefits and side effects of various drugs. (*Id.* at 200.) She noted that Plaintiff was "irritable, confrontational, [and] paranoid with impaired insight and judgement." (*Id.*)

C.  The TRC's August 1, 2003 Authorization of Involuntary Medication

On July 11, 2003, Dr. Mucowski stated that a correctional officer had found Plaintiff wandering aimlessly. (*Id.* at 329.) Dr. Mucowski further noted that after Plaintiff returned to his cell, he became engaged in a confrontation with another inmate, during which Plaintiff "got angry" and "made veiled threats . . . ." (*Id.*) According to Dr. Mucowski, Plaintiff "showed no change in his delusional disorder or presentation," that he "does not do well in a housing unit with other [inmates] who . . . try to socialize with him," and that he "is very much a loner . . . ." (*Id.*) Dr. Mucowski recommended placement in temporary close custody. (*Id.* at 330.)

On July 11, 2003, Dr. Brandoff entered a suicide watch notice for Plaintiff. (*Id.* at 331.)

According to Dr. Brandoff, Plaintiff was "upset over problems" and made "veiled threats against peers." (*Id.*) After being placed in detention, Plaintiff "began kicking door repeatedly" and stated that he "intended to keep it up all night." (*Id.*) Dr. Brandoff noted that Plaintiff had made a prior suicide attempt, and observed "[i]ncreasing paranoid accusations" on the part of Plaintiff. (*Id.*) Plaintiff refused to take his medication, as he did the following two nights. (*Id.* at 611-15.)

On July 14, 2003, Dr. Kokonos noted that Plaintiff was "preoccupied with thoughts of revenge and how others have treated him inappropriately." (*Id.* at 333.) Plaintiff was quoted as saying, "I'll die repaying everyone involved in the injustice that has been done to me," and that "I plan to dedicate my life to making sure every single person involved pays for what they have done to me." (*Id.*) Dr. Kokonos noted that Plaintiff "reported making a hangman's noose and placing it on the wall in a mocking gesture." (*Id.*) Dr. Kokonos found Plaintiff to be "emotionally unstable and inappropriate for general population." (*Id.*)

On or about July 29, 2003, Dr. Dempsey noted that Plaintiff had been transferred to the Stabilization Unit after an altercation with another inmate at Riverfront. (*Id.* at 391.) According to Dr. Dempsey, Plaintiff appeared "hypervigilant," and that "his anger and frustration with the system as well as his interactions with [Dr. Dempsey] appear to demonstrate that his paranoia is of a delusional nature." (*Id.*) Plaintiff refused medication from July 24 to July 30, 2003. (*Id.* at 637-43.)

On August 1, 2003, the TRC interviewed Plaintiff to determine whether to authorize involuntary medication. (*Id.* at 437.) According to Knowles, "Aruanno has a history of stability while under medication, when he attended groups and under Dr. Glazman's care." (*Id.*) Knowles further stated that Plaintiff "admitted that he was fairly represented by [social worker] Ms. Smith and his record was entered into evidence verbally to his satisfaction." (*Id.*) According to Knowles, "Aruanno presented an unreliable story, such as stating that he was not on any medication while at River Front State Prison and the record reflected that he did." (*Id.*) "He also stated that he has no history of violent behavior while incarcerated but his record

6

indicated that he had charges for violent behavior." (*Id.*)  Based on the TRC's interview with Plaintiff, it approved involuntary medication for 30 days. (*Id.*)

On August 28, 2003, Dr. Martin evaluated Plaintiff for continuation of involuntary medication. (*Id.* at 499.) Dr. Martin noted that Plaintiff exhibited "Delusional DO with a predominant delusion that he is constantly being persecuted." (*Id.*)  According to Dr. Martin, Plaintiff cited persecution from: "the judicial system (judges, lawyers, including his own), the criminal justice system (custody staff, administrators, parole staff), the governmental system (Social Security staff), the mental health system (especially the unit psychiatrist) and his peers ([Plaintiff] has gone through 9 [cell mates] and counting)." (*Id.*) Dr. Martin noted that Plaintiff "has reported that he will say or do whatever is necessary to get a single lock . . . ." (*Id.*) According to Dr. Martin, without medication, "[Plaintiff] presents in a manner not allowing the possibility of effective talk therapy." (*Id.*)  Dr. Martin states that "[Plaintiff] is best described as suspicious, labile, paranoid, angry, completely lacking in responsibility, insight, and judgement." (*Id.* at 500.)  According to Dr. Martin, "[t]his, coupled with his [criminal history], and serious head injury [sustained several years earlier] make him highly dangerous." (*Id.*)  His report was signed by himself, Dr. Glazman, Dr. Friedman, and registered nurses Edwards and Chavis. (*Id.*)

On January 6, 2004, Dr. Starkey noted that Plaintiff "is thinking about killing himself." (*Id.* at 835.)  Dr. Starkey quoted Plaintiff as saying that he would "rather be dead than go back [to Riverfront State Prison]." (*Id.*). On January 7, 2004, Dr. Boxer noted that Plaintiff threatened self-injury if his demands were not met. (*Id.* at 838.)

On January 15, 2004, Dr. Dempsey noted that Plaintiff had been referred to the Stabilization Unit because he reported that he would harm himself if he was moved to a prison facility. (*Id.* at 902.) According to Dr. Dempsey, Plaintiff "has a long [history] of aggression and legal threats to others," and that he "has been in a number of altercations with officers while [incarcerated]." (*Id.*) Dr. Dempsey noted that if Plaintiff moved to the general population, "he will be basically telling the DOC and staff that he will do whatever he has to to get himself out of

unpleasant circumstances . . . ." (*Id.*)

Plaintiff was released by the DOC on May 12, 2004. (*Id.* at 1347-48.) Since that time, Plaintiff has been housed at the Adult Diagnostic and Treatment Center, Special Treatment Unit, in Avenel, New Jersey. (State Defs.' Statement ¶ 1.)

### D. The Present Litigation

On June 18, 2004, and represented by *pro bono* counsel, Plaintiff filed his Amended Complaint. Defendants subsequently filed motions seeking dismissal of the Amended Complaint based on Plaintiff's failure to provide expert testimony in support of his claims. On December 23, 2005, the Court denied Defendants' motions to dismiss without prejudice, and allowed Plaintiff to file an application seeking funds from the Court's *pro bono* fund to hire an expert. Plaintiff filed his application on March 8, 2006. On March 15, 2006, the Court granted Plaintiff's application and ordered that a total of $11,000 be disbursed for payment of expert fees and deposition transcript fees.

On November 20, 2006, motions for summary judgment were filed by the CMS Defendants, the State Defendants, and Dr. Blodgett respectively. On January 17, 2007, Plaintiff filed his opposition papers to Defendants' motions. The Court notes that, according to Plaintiff's brief opposing the State Defendants' motion, "after having requested authority to retain an expert paid for by the court, plaintiff's counsel retained an expert to: (i) review plaintiff's medical records[;] (ii) interview the plaintiff; and (iii) consult with plaintiff's counsel." (Pl.'s Br. in Opp. to State Defs.' Mot. at 2 n.1.) According to Plaintiff, "[a]fter the expert completed his evaluation, plaintiff decided not to utilize the expert as a potential trial expert." (*Id.*) The parties have completed briefing the pending motions.

## II. DISCUSSION

### A. Standard of Review for Motions for Summary Judgment

In deciding a motion for summary judgment, a court should grant the motion if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987). In arguing against a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B. Standard for Claims Concerning Involuntary Medication

Prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22 (1990). The right to refuse treatment, however, is limited. *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990). The Third Circuit Court of Appeals has stated that "a prison may compel a prisoner to accept treatment when prison officials, in the exercise of professional judgment, deem it necessary to carry out valid medical or penological objectives." *Id.* "[T]he judgment of prison authorities will be presumed valid unless it is shown to be such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.*

C.     **Defendants' Motions for Summary Judgment**

In opposing Defendants' motions for summary judgment, Plaintiff claims that various prison officials threatened that his pending litigation with the State might lead to forced medication. (Pl.'s Br. in Opp. to State Defs.' Mot. at 2-3.) The only support to which he refers in support of that claim are his responses to Defendants' interrogatories. (*See id.*) In arguing against a motion for summary judgment, however, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Plaintiff fails to identify any evidence supporting his claims that his forced medication was retaliation for his pending lawsuit against the State.

Viewing the underlying facts, and drawing all reasonable inferences in favor of Plaintiff, the Court concludes that the undisputed record fails to support Plaintiff's claims. After sending an "ominously threatening" letter to the Parole Board, Plaintiff was examined by Drs. Kokonos and Brandoff. (*See supra* Part I.A.) During his meeting with Dr. Kokonos, Plaintiff expressed his belief that "it was not only his right but his duty to take revenge on those he believes have harmed him and to do so by force." (CMS Aruanno at 1237.) Dr. Brandoff found that Plaintiff suffered from "chronic, severe paranoid/persecutory delusions with threats of violent revenge," and sought authorization for involuntary medication to address Plaintiff's condition. (*Id.* at 1241.) On or about September 30, 2002, after interviewing Plaintiff and reviewing his medical record, the TRC authorized involuntary medication. (*Id.* at 1243.) In reaching its decision, the TRC referred to documented sessions in which Plaintiff "voiced violent intentions against his perceived detractors," his primary physician's observation that Plaintiff was "increasingly paranoid and speaking more directly of taking revenge on the system in a violent and potentially deadly fashion," and the observation that "his threatening letter to the Parole Board came on the heels of revealing these thoughts to the clinician." (*Id.* at 1245.) The TRC found that "the level of dangerousness and potential harm inflicted by [Plaintiff] and potential gain from psychotropic

medications exceed the potential harm from them," and therefore authorized involuntary medication. (*Id.*) On October 1, 2002, Dr. Blodgett explained the TRC's decision to Plaintiff in the presence of Plaintiff's advocate. (*Id.* at 1246.) Dr. Blodgett noted that Plaintiff continued to be preoccupied with themes of persecution, conspiracy, unfairness, and illegality. (*Id.*)

On or about November 7, 2002, after interviewing Plaintiff and reviewing his medical records, the TRC decided to continue involuntary medication of Plaintiff for an additional 180 days. (*Id.* at 1269-70.) The TRC noted Dr. Brandoff's observation that Plaintiff continues to "generalize[] what he perceives to be official malfeasance in his case and generalizes it to the whole system," and believes that his case is also corrupt. (*Id.* at 1270.)

In the subsequent months, Plaintiff continued to exhibit mental health symptoms that compromised his safety and the safety of others. For example, on or about March 27, 2003, Dr. Brandoff noted that "[s]everal of [Plaintiff's] peers have reported that he has threatened them and they are concerned about violence from him." (*Id.* at 148.) According to Dr. Brandoff, "his peers likely see [his comments] as a more immediate threat, and this grandiose defense mechanism of his does not endear him to his peers," and that it may "even place[] him in physical danger." (*Id.*) On or about April 11, 2003, Dr. Brandoff reported that Plaintiff had not adjusted well in the general population, and that he "has gone through 9 [cell mates] recently, and has difficulty getting along with anyone." (*Id.* at 162.)

On July 11, 2003, after a confrontation between Plaintiff and another inmate, Dr. Mucowski examined Plaintiff and found that he "showed no change in his delusional disorder or presentation," that he "does not do well in a housing unit with other [inmates] who . . . try to socialize with him," and that he "is very much a loner." (*Id.* at 329.) Dr. Mucowski recommended placement in temporary close custody. (*Id.* at 330.) On that same date, Dr. Brandoff entered a suicide watch notice for Plaintiff because he was "upset over problems" and made "veiled threats against peers." (*Id.* at 331.) Dr. Brandoff noted that Plaintiff had made a prior suicide attempt, and observed "[i]ncreasing paranoid accusations" on the part of Plaintiff.

(*Id.*)  Plaintiff refused to take his medication, as he did the following two nights.  (*Id.* at 611-15.)  On July 14, 2003, in a meeting with Dr. Kokonos, Plaintiff "reported making a hangman's noose and placing it on the wall in a mocking gesture."  (*Id.* at 333.)   Dr. Kokonos found Plaintiff to be "emotionally unstable and inappropriate for general population."  (*Id.*)  Plaintiff refused medication from July 24 to July 30, 2003.  (*Id.* at 637-43.)

On August 1, 2003, the TRC again interviewed Plaintiff to determine whether to authorize involuntary medication.  (*Id.* at 437.)  According to Knowles, "Aruanno has a history of stability while under medication, when he attended groups and under Dr. Glazman's care."  (*Id.*)  Knowles observed several statements by Plaintiff that were inconsistent with his prior medical history.  (*Id.*)  Based on its interview with Plaintiff and his medical records, the TRC approved involuntary medication for 30 days.  (*Id.*)

In light of these facts concerning Plaintiff's mental health symptoms, the safety risks that these symptoms created, and the lack of any expert evidence showing that Defendants' actions constitute a "substantial departure from accepted professional judgment, practice or standards," *White*, 897 F.2d at 113, the Court concludes that Defendants are entitled to judgment as a matter of law.

### III.     CONCLUSION

For these reasons, each the Defendants' respective motions for summary judgment are granted.  An appropriate form of order is filed herewith.

Dated:  April 20, 2007

                                                     s/ Garrett E. Brown, Jr.
                                                GARRETT E. BROWN, JR., U.S.D.J.